**The STATE of Ohio, Appellee,**

v.

**WHITSELL, Appellant.**

[Cite as *State v. Whitsell* (1990), 69 Ohio App.3d 512.]

Court of Appeals of Ohio,
Ashtabula County.

No. 1351.

Decided Sept. 24, 1990.

*Gregory J. Brown*, Prosecuting Attorney, and *Philip D. Gerken*, Assistant Prosecuting Attorney, for appellee.

*Kenneth R. Callahan*, County Public Defender, and *Joseph A. Humpolick*, Assistant County Public Defender; *Thomas Hitchcock*, for appellant.

---

CHRISTLEY, Presiding Judge.

This case concerns the homicide of Kathleen Miller.

On the evening of January 2, 1987, the victim persuaded a male friend to drive her to a local bar for approximately one hour. The couple then went to a second establishment called the Flamingo Lounge, located on West Avenue in Ashtabula. At approximately 2:30 a.m. when they arrived at this bar, they were not allowed in as it was closing. Instead, they began to talk to three males who were standing outside the bar.

After nearly fifteen minutes, the victim's friend left and went home to Geneva. Before leaving, he vainly attempted to persuade the victim to accompany him, believing she was intoxicated. About that same time, one of the other three males, Edward Nappi, also left. Sometime after this, the bar's security guard saw the victim get into the car of one of the two remaining males. This person had long black hair and a full beard. A second male was also in the car.

At approximately 3:00 a.m. that same night, a locomotive engineer for Conrail was operating an engine near the West Avenue overpass in Ashtabula. This structure is located about a quarter of a mile south of the Flamingo and goes over a railroad access road. While passing through, the engineer saw a dark-colored sedan sitting below the overpass, next to one of the abutments. He also saw a man with shaggy hair and a beard standing by the

car. This man had his hands on the car and was acting as if he were kicking something. The engineer observed this for about fifty seconds.

At approximately 6:30 a.m. on January 3, a railroad worker found the victim's body below the West Avenue overpass. The victim was dead at that time. Her pants and undergarment were below her hips and around her thighs. The zipper on her pants had been ripped. The two shirts the victim had been wearing were pulled directly below her breasts. Her face had been bloodied and she was lying in a pool of blood. In addition, three parts of a broken snow scraper were found beside her, along with a piece of car chrome.

An autopsy performed the next day, January 4, revealed the following injuries: multiple cuts or abrasions on the head, breasts, hips, anus, and knees; a fractured jaw; a fractured skull; multiple loose teeth; broken ribs; a partially collapsed lung; a lacerated rectum; severe damage to the vaginal cavity; and a perforation in the vaginal wall. The coroner determined that death had been caused by the ramifications of the fractured skull.

On the evening of January 3, Patrolman Charles Stickle of the Ashtabula City Police Department received a phone call from the security guard at the Flamingo, who stated that he had seen the victim get into a car with Dean Prisco and an unidentified man. The guard also stated that he had seen Edward Nappi with them before they had left the parking lot. Patrolman Stickle contacted Nappi, who subsequently told the officer that the bearded man was appellant Timothy Whitsell. He also told the officer where appellant lived and what type of car he drove.

Conducting his own investigation, Stickle ran a computer check on appellant's name and learned that appellant was currently driving with a suspended license. Then, at approximately 12:00 p.m. on January 4, Stickle was informed by Nappi that appellant was back at the Flamingo. Upon arriving at the bar, Stickle and a city solicitor examined the appellant's car in the Flamingo parking lot and noted a number of reddish or maroon stains on the seat and the inside of the door. There was no evidence or testimony indicating that the doors of the car were opened during this examination.

Shortly thereafter, Patrolman Stickle met two other patrolmen in the parking lot of a roller den. This establishment is located in the same plaza on West Avenue as the Flamingo. He gave these officers a description of appellant and his car and told them that appellant was suspected of driving under a suspension. He also pointed out the car in the Flamingo parking lot.

A few minutes before 1:00 p.m., appellant left the bar and headed north on West Avenue. Riding in separate patrol cars, both officers followed appellant. Both noted that appellant's car did not have a front license plate and that one of the taillights was broken. After appellant had made a right turn

onto Lake Avenue, the officers pulled appellant over and subsequently arrested him for driving under suspension. One officer then transported appellant back to the police station, while the other waited for the vehicle to be towed.

Based upon the preliminary investigation conducted before appellant was arrested, the Ashtabula police also knew where appellant lived and that he lived with a woman named Sharon Carlson. At approximately the same time that appellant was being arrested, two city detectives, one patrolman, and a city solicitor went to the couple's residence on Aberdeen Avenue and contacted Carlson. After a brief conversation, Carlson agreed to go to the police station and make a statement. Her statement was essentially as follows: she was the actual owner of the car appellant had been driving; on the evening of January 2, appellant was gone from approximately 7:30 p.m. until 4:00 a.m. on the morning of the third; she found a welfare card belonging to the victim in her car; and the clothes appellant had worn that night were bloodied. During this time, Carlson agreed to allow the police to search the house and the car.

After being confined in a holding cell for about two hours, appellant was taken to the office of Detective Robert Simons. Before being questioned, appellant was informed of his *Miranda* rights. A pre-interview form was completed, in which appellant was read each right and asked to initial the form if he understood each right and wished to waive it. When told of his right to an attorney, appellant asked if he needed one. The detective replied that he could not advise appellant on that. Appellant then finished completing the form. It was at that point the detective told him that the questioning would concern the death of Kathy Miller.

Appellant gave both an oral and written statement. The crux of his statement was as follows: The victim and Dean Prisco got into appellant's car at the Flamingo. After about ten minutes, the victim pushed Prisco out of the car. Appellant then drove to the spot beneath the overpass and propositioned the victim. She became enraged and began to hit appellant with her fists and the snow scraper. He then punched her twice in the face and pushed her out of the car. After seeing that she was hurt but still alive, he threw the broken scraper on the ground and went home.

The following day, January 5, appellant made a second written statement, which added some details to the basic statement he had given the day before. Appellant was again advised of his rights before this statement was made.

On February 4, appellant was indicted on the following four charges: aggravated murder, R.C. 2903.01(B); rape, R.C. 2907.02(A)(2); felonious sexual penetration, R.C. 2907.12(A)(2); and kidnapping, R.C. 2905.01(A)(4). On April 7, another charge of aggravated murder under R.C. 2903.01(A) was added to the indictment.

Before the matter could come to trial, appellant moved the Ashtabula County Court of Common Pleas to suppress certain evidence the police seized during the period immediately after his arrest. This evidence included, *inter alia,* all tangible items and information taken from him during his incarceration, all items and information taken from the car, and all items and information taken from his home on Aberdeen Avenue. Appellant's basic argument was that the initial arrest for driving under a suspension had been a pretext for a generalized search for information concerning the victim's death. After a hearing, the trial court denied the motion.

After a two-week trial, the jury found appellant guilty under the first and third counts of the indictment, aggravated murder under R.C. 2903.01(B), and felonious sexual penetration. As to the second aggravated murder charge, appellant was found not guilty, but guilty of the lesser crime of murder. The trial court then sentenced appellant to life for aggravated murder and an indefinite term of ten to twenty-five years for felonious sexual penetration. The murder conviction was set aside.

On appeal to this court, appellant assigns the following as error:

"1. The Trial Court erred to the prejudice of Defendant–Appellant when it overruled his motion to suppress his statements and physical evidence from the trial of this case.

"2. The Trial Court erred to the prejudice of Defendant–Appellant when it overruled his motion to suppress his statements made to police interrogators while he was in jail.

"* * * *

"8. Appellant was deprived of due process of law because he was convicted of felonious sexual penetration in violation of Revised Code 2907.12 without support of the manifest weight of the evidence.

"* * * *" ■

The first two assignments in this appeal address the merits of the trial court's ruling on appellant's motion to suppress. Under his first assignment, appellant submits that the various pieces of evidence the police obtained following his arrest should have been suppressed because the arrest was not valid. Specifically, appellant argues that his arrest for driving under suspension was a mere pretext, designed to enable the police to interrogate him and inspect the car. This argument is essentially predicated upon the fact that

appellant was the primary suspect in the murder investigation at the time of the arrest.

In overruling this aspect of the motion to suppress, the trial court held that both the initial stop and ensuing arrest were proper because the arresting officers had probable cause to stop appellant on the traffic violation. The court also found that appellant had not been arrested for the purpose of gathering evidence concerning the murder. As to the latter point, the court emphasized that the arresting officers had not questioned appellant, nor searched his person or the car.

Nevertheless, the testimony presented at the suppression hearing supports appellant's characterization of the arrest. The issue is, however, whether a pretextual arrest as defined by appellant is sufficient to invalidate the arrest and its evidential fallout.

In the context of the Fourth Amendment, the term "pretext" commonly refers to an exploratory search for evidence that is not related to the offense upon which the initial intrusion is supposedly based:

" * * * [T]he pretext arises out of the fact that the evidence is found in a search which would not have occurred at all but for the manipulation of circumstances and events by the police because of their desire to conduct a search which could not otherwise be lawfully made." 2 Lafave, Search and Seizure: A Treatise on the Fourth Amendment (2 Ed.1987) 141, Section 7.5(e).

In relation to investigatory stops, the term has been defined in the following manner:

"A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example, * * * occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." *United States v. Guzman* (C.A.10, 1988), 864 F.2d 1512, 1515.

In this case, as of the morning of January 4, appellant was clearly the focus of the investigation. At that time, Patrolman Stickle, one of the two police officers heading the investigation, knew that appellant had been seen leaving the Flamingo with the victim on the night of the incident. Through this same witness, the officer also knew where appellant lived and the type of car he was driving.

At approximately 12:00 p.m. on January 4, the witness informed Stickle that appellant was again at the Flamingo. In response, Stickle drove to the lounge and inspected appellant's car in the parking lot. He then spoke to two other

patrolmen concerning the car and told them that appellant was presently driving with a suspended license. Accordingly, the two patrolmen stayed in the immediate vicinity of the Flamingo and followed appellant when he left. Noticing that a taillight was broken and that the front license plate was missing, the patrolmen pulled appellant over and arrested him. He was also cited for the suspension.

Although he told the arresting officers that appellant was a suspect in the murder investigation, Stickle never specifically directed them to stop appellant. In addition, there is no indication in the record that the circumstances which resulted in appellant's arrest were somehow contrived or "created" by the police, *i.e.*, the evidence does not show that the witness was acting under the direction of the police when he met appellant at the Flamingo. The witness merely informed Stickle where appellant was and when he was leaving the bar.

Moreover, the evidence supports the trial court's finding that appellant was neither searched nor questioned at the time of the arrest. Before placing appellant in a squad car and transporting him to the police station, one of the arresting officers conducted a cursory "pat down" search. The purpose for this search was to ensure that appellant was not carrying any weapons. The remaining officer radioed for a wrecker and conducted an inventory search of the interior of the car. This action was in accordance with the usual procedure for towing an impounded vehicle.

Yet, it is also clear from the evidence that not only did the patrolmen intentionally wait for appellant to leave the bar, but that they would not have been in the area if Stickle had not alerted them to the situation. The evidence additionally demonstrates that under normal circumstances, two patrolmen in separate cars are not used in making a simple traffic stop. Thus, under appellant's definitions and arguments, it could be inferred that the driving-under-suspension charge was employed as a pretext for taking appellant into custody when probable cause did not exist to arrest him on the murder charge.

Although it has never considered the type of situation presented by the facts in the instant case, the United States Supreme Court has repeatedly stated that an arrest cannot be used as an excuse to conduct a general exploratory search. *Harris v. United States* (1947), 331 U.S. 145, 153, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399, 1407. In the majority of the cases in which this point has been addressed, the evidence sought in the search was associated with the *same* offense for which the person was being arrested. See *Go-Bart Importing Co. v. United States* (1930), 282 U.S. 344, 51 S.Ct. 153, 75

L.Ed. 374; *United States v. Rabinowitz* (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

The term "pretext" was first used by the United States Supreme Court in *United States v. Lefkowitz* (1932), 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877. The defendants in that case were arrested for soliciting orders for liquor. At the time the arrest warrants were executed, the Prohibition agents conducted a thorough search of the premises where the orders were taken. Evidence supporting the arrest was found. In concluding that the search violated the Fourth and Fifth Amendments, the Supreme Court held that a general search was unreasonable as an incident of a valid arrest. The opinion emphasized that such a search would not even be proper under a valid search warrant, which must specifically state the items sought.

At the conclusion of its analysis, the *Lefkowitz* court set forth the following general rule: "An arrest may not be used as a pretext to search for evidence." *Id.* at 467, 52 S.Ct. at 424, 76 L.Ed. at 884. This statement has been quoted by numerous state and federal courts. In the majority of these cases, however, the issue raised by the facts does *not* concern the scope of a search for additional evidence of the same charge conducted as part of an otherwise valid arrest. Instead, the issue, as in the instant case, is whether the authorities arrested the defendant on a minor crime in order to search for evidence concerning another more serious crime, an issue significantly different from the one addressed in *Lefkowitz*.

While it is clear under the Supreme Court precedent that a pretextual arrest is invalid, *Lefkowitz* and subsequent Supreme Court decisions do not provide a clear standard for determining *when* an arrest, such as the one in the instant case, falls under this prohibition. In ruling upon the question now facing our court, federal appellate courts subsequent to *Lefkowitz* have followed one of three separate standards. The first of these standards stressed the subjective intent of the authorities: "Whether or not an arrest is a mere pretext to search is a question of the motivation or primary purpose of the arresting officer." *Williams v. United States* (C.A.9, 1969), 418 F.2d 159, 161.

Under this "subjective" standard, the determinative factor is whether the authorities acted in good faith in arresting the defendant on the minor offense. See *State v. Blair* (Mo.1985), 691 S.W.2d 259, 262. In most instances, this determination has been based upon the court's interpretation of the circumstances surrounding the arrest. Cf. *Taglavore v. United States* (C.A.9, 1961), 291 F.2d 262, and *Amador–Gonzalez v. United States* (C.A.5, 1968), 391 F.2d 308. As a general matter, the courts applying this standard have failed to cite any authority for this holding, although it has been argued

that the standard follows from the *Lefkowitz* decision. *United States v. Kordosky* (C.A.7, 1989), 878 F.2d 991, 995 (Will, J., concurring).

The precedent for the "subjective" standard dates back to at least 1950. See *Amador–Gonzalez, supra,* 391 F.2d at 313, citing *McKnight v. United States* (C.A.D.C.1950), 183 F.2d 977. In the last decade, however, many federal courts have begun to question the wisdom of attempting to discern the intent of the police; instead, courts have held that the propriety of the arrest should be based upon more objective criteria. Such an "objective" standard has been adopted, in one form or another, by a number of circuit courts. See, *e.g., United States v. Nersesian* (C.A.2, 1987), 824 F.2d 1294; *United States v. Hawkins* (C.A.3, 1987), 811 F.2d 210; *United States v. McCarty* (C.A.7, 1988), 862 F.2d 143.

As authority for this type of standard, these courts have referred to the propensity of the Supreme Court to determine Fourth Amendment issues on the basis of objective facts. For example, the court has expressly stated that an "objective" standard must be employed in determining the validity of an investigatory stop, *i.e.,* "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio* (1968), 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906. In applying this particular standard in subsequent cases, the court has reiterated the objective nature of the standard. See *Hawkins, supra,* 811 F.2d at 213, citing *United States v. Cortez* (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621.

More important, though, in ruling upon other Fourth Amendment questions, the Supreme Court has consistently stated that the subjective intent of the police is irrelevant. In *Scott v. United States* (1978), 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168, the defendants sought the suppression of evidence obtained through the use of a wiretap, on the grounds that the police had intentionally failed to follow the minimization requirements of the applicable law. Upholding the reversal of the district court's judgment suppressing the evidence, the court agreed with the court of appeals that the underlying motivation of the officers was not a factor to be considered in deciding whether the search was objectively reasonable:

"We have since held that the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 138, 98 S.Ct. at 1723, 56 L.Ed.2d at 178.

In each of the following cases, the Supreme Court again stated, at least in dicta, that the authorities' subjective intent was irrelevant to the Fourth

Amendment analysis: *United States v. Villamonte–Marquez* (1983), 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (defendants argued that the boarding of a sailboat to inspect its documents was improper because officers actually sought to investigate a drug trip); *United States v. Hensley* (1985), 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (officer's intent to arrest on improper grounds does not affect the validity of an investigatory stop based on reasonable suspicion); *Maryland v. Macon* (1985), 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (purchase of obscenity does not constitute a seizure even though officers intended to retrieve the marked money). For a further discussion of these cases, see *Hawkins, supra,* 811 F.2d 210; *Guzman, supra,* 864 F.2d 1512; *United States v. Causey* (C.A.5, 1987), 834 F.2d 1179.

In this state, the case law dealing with the pretext issue is extremely limited. Earlier cases merely refer to the Supreme Court precedent and then cite federal cases in which the "subjective" standard was employed. See *State v. Coles* (1969), 20 Ohio Misc. 12, 49 O.O.2d 21, 249 N.E.2d 553; *Cleveland v. Tedar* (Mar. 4, 1976), Cuyahoga App. No. 34622, unreported; *State v. Bradley* (1971), 26 Ohio App.2d 229, 233–236, 55 O.O.2d 387, 390, 270 N.E.2d 654, 658 (Stephenson, J., concurring). However, at least one recent decision has specifically stated that an "objective" standard should be used in determining whether an arrest was a pretext to search. *State v. Sammour* (Apr. 16, 1987), Cuyahoga App. No. 51584, unreported, 1987 WL 9851. Moreover, a recent case has also noted the precedent concerning the relevance of the police's subjective intent. *State v. Hall* (June 30, 1986), Lucas App. No. L–85–403, unreported, 1986 WL 7373.

Although the federal decisions adopting an "objective" standard on the pretext question are not binding, this court finds the logic of these cases persuasive. As noted earlier, *Lefkowitz* and its progeny do not provide any guidance as to the test to be followed in determining whether an arrest was pretextual in relation to a subsequent arrest on a more serious matter. Specifically, there is nothing in these cases to indicate that the test for judging these arrests should be different from that employed in other situations. In addition, the court's recent statements concerning the unimportance of the police's motivation in Fourth Amendment analysis clearly supports the conclusion that an "objective" standard is proper. Again, there is nothing in the language of these recent decisions to indicate that the court would require a different type of analysis in a pretext situation.

Practical considerations also support the use of an "objective" standard. First, placing the emphasis of the analysis on intent would encourage police misconduct, since the officer could simply lie when later questioned about his motivation in making the arrest. *Guzman, supra,* 864 F.2d 1512, citing

*United States v. Arra* (C.A.1, 1980), 630 F.2d 836. Second, a "subjective" test could discourage legitimate police conduct because the officer might fear that his or her actions might jeopardize a later investigation.

 Even though a majority of the federal circuit courts which have considered the pretext question have adopted an "objective" test, there is still some disagreement as to the exact form the test should take. At least two circuits have applied a standard which has been referred to as the "purely objective" test. Under this test, "the search incident to the arrest is legal so long as the arresting officer possesses sufficient information to give him probable cause to arrest." *Kordosky, supra,* 878 F.2d at 993. See, also, *Causey, supra,* 834 F.2d 1179.

The second objective standard has been referred to as the "reasonable officer" test. As the name implies, the focus of the inquiry under this standard is what a reasonable officer would do, in contrast to what an officer could validly do:

"When a defendant alleges that an arrest was pretext to conduct an otherwise impermissible search, the appropriate inquiry is whether a reasonable officer would have made the arrest absent an illegitimate motive to search. See *United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986). If a reasonable officer would not have made the arrest absent illegitimate motive, then the resulting search incident to or inventory is unlawful." *United States v. Johnson* (C.A.5, 1987), 815 F.2d 309, 315.

Under this analysis, heavy emphasis is placed upon the *usual procedure* an officer employs in performing his duties. If the officer deviates from common practice in making the arrest, the arrest is deemed a pretext and is invalid. *Guzman, supra,* 864 F.2d 1512.

Of the two objective standards for pretextual arrests, the latter would appear to be more consistent with the type of analysis the Supreme Court has employed in its Fourth Amendment decisions. As mentioned earlier, the *Terry* court specifically adopted a reasonable man standard for determining whether an intrusion was objectively justified. Based upon this precedent, it follows that an arrest should not be considered pretextual when the arrest is valid *and* the officer's actions are consistent with the normal procedure.

Moreover, the "reasonable officer" standard is also preferable because it places some limitations upon the discretion of the police. In comparison, under the "purely objective" standard, the officer's actions before the arrest are simply irrelevant to the inquiry; no pretext will be found if the arrest itself is valid. This latter standard gives the police almost unfettered discretion in using any minor offense as a pretext for conducting a search for

evidence of a more serious crime. See *Guzman, supra,* 864 F.2d at 1516. In fact, such a standard would appear to nullify the prohibition against pretextual arrests.

Under the reasonable officer test, though, the officer's actions before the arrest must be in accordance with the usual procedure. Thus, this standard prevents the police from using any minuscule reason to arrest a suspect, while still providing an objective test for measuring the constitutionality of the officer's behavior.

In this case, the arresting officers were given reliable information from a fellow officer concerning appellant's driving status. Considered out of context, this action is obviously consistent with normal police procedure.

Upon receiving this information, the arresting officers remained in the vicinity of the Flamingo and waited for appellant to leave. Although the evidence is not precise on this point, apparently the officers did not have to wait very long. Then, when appellant drove in violation of his suspension, the officers followed him, noting two additional violations, and initiated the stop.

This court believes that these actions were consistent with what a reasonable officer would do when he knew that an individual was about to drive even though his license had been suspended.

Even though both of the arresting officers testified at the suppression hearing that the initial stop was based upon a broken taillight and the failure to display a front license plate, these offenses would also constitute valid grounds for stopping a motorist. While a police officer might overlook a minor equipment violation, it is unlikely that he would ignore a missing license plate, particularly when he had knowledge of a potential license suspension. Thus, the action of the arresting officers in either case was consistent with what a reasonable officer would do in enforcing the laws of this state. This court holds that appellant's arrest was valid.

Under his second assignment, appellant narrows the focus of his analysis to the admissibility of the two statements he gave to the police following his arrest. Appellant maintains that regardless of the legality of the arrest, the two statements should have been suppressed because the police violated his right to counsel. Specifically, appellant contends that the statements should not have been taken because he had properly invoked his right to an attorney before the police began to question him about the incident. This argument lacks merit.

Approximately two and one-half hours after his arrest, appellant was taken from a holding cell and escorted to an office in the Ashtabula City Police Department. Before asking any questions concerning the incident, the inter-

rogating officer, a detective with the department, began to advise appellant of his *Miranda* rights. These rights were listed on a written waiver form. As part of the procedure for completing this form, the interrogating officer read each right to appellant and then asked if he understood what it meant.

At the suppression hearing, appellant's alleged invocation of his right to counsel was recounted by the interrogating officer as follows:

"Q. Now, at any time during the advisement portion, was there any conversation concerning counsel or attorney?

"A. I believe while he was being read the form letter, it was number five, 'You have the right to talk with a lawyer and have him present while you are being questioned.' Mr. Whitsell indicated to me, he said—his words were, 'Do you think I need one,' question. I told Mr. Whitsell at that time it was not in his best interest for me to be answering that question. I said that was a decision he had to make. I could not tell him whether he needed a lawyer or did not need a lawyer.

"Q. Did he request an attorney upon that response?

"A. No, he did not.

"Q. Did he complete the questionnaire form?

"A. Yes, he did."

During cross-examination, the officer essentially restated his earlier testimony:

"Q. There came a time when Mr. Whitsell indicated that he was having thoughts about wanting to see an attorney, didn't there?

"A. Yeah, there came a time, like I testified to earlier, item number 5, you have the right to talk to a lawyer and have him present while you're being questioned. His response to that was, 'Do you think I need one,' was his response.

"* * *

"Q. Did you tell him after he asked that that it doesn't really matter because you're going to charge him with something anyway?

"A. I did not say that. I told him it was not for me to answer that question for him. That was something he had to decide himself.

"* * *

"Q. Now, after Mr. Whitsell looked at you and said quote, 'Do you think I need'—referring to a lawyer and you said it's not in your best interest for me to answer that, you then proceeded on to advise him of the rest of his rights; didn't you?

"A. That is correct."

Pursuant to the landmark constitutional principles set forth in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the police are required to terminate any interrogation of an individual once he has invoked his right to counsel. "At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Id.* at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. In defining this principle further, the Supreme Court has also held that once the request for counsel is made, the questioning cannot resume until an attorney is present or the individual himself reinitiates the discussion with the police. *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. See, also, *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323.

In *Miranda,* the court also emphasized that the foregoing procedure must be followed whenever the individual gives any indication that he wishes to remain silent. Citing this language, many lower federal courts have held that ambiguous statements by the accused must be closely examined to determine whether he intended to invoke his rights. This particular precedent was cited with approval by our state Supreme Court in *State v. Jones* (1974), 37 Ohio St.2d 21, 66 O.O.2d 79, 306 N.E.2d 409. Cf. *State v. Fields* (1984), 13 Ohio App.3d 433, 13 OBR 521, 469 N.E.2d 939, in which the Eighth Appellate District held that the request for counsel must be stated with sufficient clarity and specificity to warrant the termination of the interrogation.

In this case, appellant's statement to the interrogating officer was certainly sufficient to indicate that at that particular moment, he was still uncertain whether to invoke his right to counsel. That the officer realized this can be seen from his response to appellant's question.

Nevertheless, the question was ambiguous, in that it was not a definite request. Thus, the issue before this court is whether the officer was required to immediately terminate his discussion with appellant.

Although the Supreme Court has specifically referred to this issue, it has never resolved the point. See *Connecticut v. Barrett* (1987), 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920, and *Smith v. Illinois* (1984), 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488. In *Smith,* at 96, 105 S.Ct. at 493, 83 L.Ed.2d at 494, fn. 3, the court noted that three separate lines of authority exist on this question.

The first set of cases to which the court referred essentially holds that any statement or reference to an attorney is sufficient to warrant the immediate termination of all questioning. In support of this position, these cases generally point to the language in *Miranda,* mentioned earlier, in which the court stated that the right to counsel can be invoked in any manner. See, *e.g.,*

*People v. Superior Court* (1975), 15 Cal.3d 729, 125 Cal.Rptr. 798, 542 P.2d 1390. As appellant correctly notes, courts adopting this standard have held that statements similar to the one in this case were sufficient to invoke the right. See, also, *State v. Tapply* (1983), 124 N.H. 318, 470 A.2d 900, in which the accused asked whether he needed to speak to an attorney before answering any questions.

The courts in the second set of cases, in the words of the Supreme Court, "have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel." *Smith, supra,* 469 U.S. at 96, 105 S.Ct. at 493, 83 L.Ed.2d at 494, fn. 3. The leading decision under this line of authority is *People v. Krueger* (1980), 82 Ill.2d 305, 45 Ill.Dec. 186, 412 N.E.2d 537. In that case, the Illinois Supreme Court held that the following type of statement was not sufficient: "Maybe I ought to have an attorney." Stating that a more positive assertion was required, the court stressed that the interrogating officers had not considered the accused's statement to be a request for counsel.

The final line of cases on this issue places less emphasis upon the exact nature of the ambiguous request. Under this standard, if the accused's statement is arguably a request for counsel, all questioning concerning the alleged crimes must immediately end; however, the officer can ask questions concerning the meaning of the accused's reference to counsel. Stated differently:

" * * * [W]henever even an equivocal request for an attorney is made by a suspect during a custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. * * * And no statement taken after that request is made and before it is clarified * * * can clear the *Miranda* bar." (Emphasis *sic.*) *Thompson v. Wainwright* (C.A.5, 1979), 601 F.2d 768, 771–772.

This standard has been adopted by a number of federal circuit courts. See, *e.g., United States v. Porter* (C.A.1, 1985), 764 F.2d 1; *United States v. Riggs* (C.A.4, 1976), 537 F.2d 1219; and *Martin v. Wainwright* (C.A.11, 1985), 770 F.2d 918.

Surprisingly, research on the ambiguous request issue shows that our state Supreme Court has never addressed this question. There is also little authority at the appellate level. In *State v. McCarroll* (Dec. 21, 1989), Franklin App. No. 88AP–978, unreported, 1989 WL 155215, the Tenth Appellate District expressly adopted the *Thompson* standard, holding that the police can seek the clarification of an equivocal reference to counsel. For the following

reasons, this court also holds that this is the most sensible procedure for the authorities to follow in this type of situation.

First, as was noted in *Nash v. Estelle* (C.A.5, 1979), 597 F.2d 513, the *Miranda* decision itself states that the police, in certain situations, can ask the accused to clarify an ambiguous reference to counsel. After delineating the basic procedure the police must follow before questioning an individual, the court noted that this procedure was consistent with that which the FBI was already using. The court then quoted a statement concerning the FBI procedure, which contained the following language:

" 'If he [the accused] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent.' " *Miranda, supra,* 384 U.S. at 485, 86 S.Ct. at 1633, 16 L.Ed.2d at 730.

Second, it must be emphasized that allowing the police to seek clarification of a reference to counsel does not conflict with the proposition that the right to counsel can be invoked *in any manner.* As the *Thompson* court stressed, after the equivocal statement is made, all further questioning must be limited to ascertaining the meaning of the accused's statement. This requirement forces the police to stop all questioning concerning the alleged crimes until the clarification is given.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, the Supreme Court elaborated upon the reasoning behind *Miranda:*

"A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means * * * to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored * * *.' 384 U.S., at 479 [86 S.Ct. at 1630, 16 L.Ed.2d at 726]. * * * The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' Id., at 474 [86 S.Ct. at 1628, 16 L.Ed.2d at 723]. * * * Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. * * * We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* whether his 'right to cut off questioning' was 'scrupulously honored.' " (Citations omitted.) *Id.,* 423 U.S. at 103–104, 96 S.Ct. at 326, 46 L.Ed.2d at 321.

As long as the clarification questions are not used as a means of coercing the accused into giving a statement, *Nash, supra,* 597 F.2d at 513, the standard adopted in the case clearly is in compliance with *Mosley.* When done in the correct manner, asking the accused to clarify his statement does not impinge upon his right to remain silent.

As a practical matter, it should also be noted that this procedure relieves the police of the burden of having to guess whether a statement was sufficient to invoke the right to an attorney.

In many of the cases in which this procedure has been followed, the ambiguous reference to counsel was made *after* the interrogation had already begun. When that is the case, the courts have held that the interrogating officer must specifically ask whether the individual wants an attorney. See *Porter, supra*, 764 F.2d 1.

That is not the case here. No interrogation had begun. In the instant case, after the officer stated that he could not advise appellant, he proceeded to the next statement on the form, which informed appellant that he had the right to stop the questioning at any time. After being informed of the remainder of his *Miranda* rights, appellant signed the waiver.

Given these circumstances, the procedure followed by the officer was sufficient to comply with the *Thompson* standard. We feel it is significant that the actual interrogation concerning the incident did not begin until *after* appellant had signed the waiver. By immediately advising appellant that he could stop the interrogation at any time, the officer clearly gave appellant the opportunity to reconsider the issue before expressly waiving his rights.

Regarding the latter point, this court also notes that the evidence presented at the suppression hearing supports the conclusion that the waiver was made voluntarily and knowingly. The record is void of any evidence of coercion or deception by the police.

In relation to the waiver issue, appellant next points out that he was not informed of the nature of the questioning until after he had signed the waiver. As a result, appellant argues that the waiver was not made knowingly, since he did not know that the interrogation would concern the murder.

However, in *Colorado v. Spring* (1987), 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954, the Supreme Court held that the failure to inform the individual of the topic of the questioning does not invalidate a waiver of *Miranda* rights. The court emphasized that this information is not needed in order for the individual to understand his rights. "Here, the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." *Id.* at 577, 107 S.Ct. at 859, 93 L.Ed.2d at 967.

By signing the waiver form, appellant expressly indicated to the interrogating officer that he did not want to speak to an attorney at that point. However, even if appellant had unequivocally invoked his right to counsel earlier, this waiver would not be sufficient to allow the police to initiate the questioning; in those circumstances, the individual must also have been the

party who reinitiates the discussion. See *Edwards v. Arizona, supra,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

Here, though, appellant's reference to counsel was ambiguous. By indicating that he understood his rights and then by signing the waiver, appellant clarified his reference. Under these circumstances, this court finds that the police did not violate appellant's right to counsel, and that his two statements to the police were admissible.

&ast; &ast; &ast; 2

■ Under his eighth assignment of error, appellant argues that his conviction under the charge of felonious sexual penetration should be overturned because the state failed to prove that the victim was still alive when the penetration occurred. This argument is predicated upon the conflicting testimony of the state's pathologist.

During direct examination, the pathologist did not specifically comment upon this particular issue. He merely stated that the injuries to the head were probably inflicted first, and that the injuries to the upper torso occurred near the time of death. Upon cross-examination, though, the pathologist gave the following testimony concerning the vaginal and rectal injuries:

"Q. Now, did you reach any sort of conclusions, therefore, based on what you saw, what those injuries were prior to death, the perforations are?

"A. I believe in my autopsy report I said they probably occurred after death.

"Q. In fact, that's in your report, is that right?

"A. That's what I stated.

" &ast; &ast; &ast;

"Q. And you said that these perforations that you talk about, these four perforations, probably occurred after death, is that right?

"A. I made that statement.

"Q. You stand by it in Court today, is that right?

"A. I do not.

"Q. You do not now?

"A. I would like to—no, I feel I can only say they probably occurred around death or after death. I cannot say that they did not occur at death.

"Q. Let me put it to you this way. You can't say to reasonable medical certainty that those perforations occurred before death, is that right?

---

**2.** See fn. 1.

"A. Before death?

"Q. Yes.

"A. I feel that they did not occur before death because of the lack of findings, lack of hemorrhage in the areas."

As appellant notes, the foregoing testimony does not support the finding that the victim was living when these particular injuries occurred.

In maintaining that his conviction for felonious sexual penetration cannot be upheld, appellant essentially argues that the state must prove that the victim was still alive when the act occurred. Research on this point has failed to disclose any prior authority in this state on this issue. The statute itself, R.C. 2907.12(A), does not provide a direct answer to this question. It merely refers to victim as a "person."

In relation to this point, this court notes that the rape statute, R.C. 2907.02(A), also refers to the victim as a person. While the precedent on the issue is again extremely limited, the Tenth Appellate District has recently held that, at least under some circumstances, the state is not required to prove that the victim was alive when the rape took place. *State v. Collins* (1990), 66 Ohio App.3d 438, 585 N.E.2d 532. In that case, the victim was strangled to death before being raped. After noting that the rape statute did not explicitly require a living victim, the court held that the defendant's actions did not constitute sexual abuse of a corpse:

"More important, we conclude that the existence of the abuse of corpse statute does not indicate that the legislature intended conduct like defendant's and his companions' to fall outside the scope of the rape statute. Even though the victim died during the incident in the present case, defendant's conduct, when viewed in its entirety, involved 'indignities to the living,' unlike the conduct that R.C. 2927.01 contemplates. In the present case, defendant 'engage[d] in sexual conduct' with the victim only after he had 'purposely compel[led]' the still living victim 'to submit by force.' R.C. 2907.02. The fact that the force was sufficient to kill the victim does not lessen the seriousness of defendant's actions." *Id.* at 443, 585 N.E.2d at 536.

Since the language of R.C. 2907.02 and 2907.12, and the acts which each prohibits, are similar, this court holds that this same analysis is also applicable to the felonious sexual penetration statute. By defining a separate offense with a lesser penalty, the legislature obviously intended for the abuse of a corpse statute, R.C. 2927.01, to cover acts that are distinct from those which cause the death of the individual. Moreover, the intent or state of mind needed to prove an abuse of a corpse is vastly different from that which is needed to show felonious sexual penetration.

In this case, the pathologist testified that the injuries in the pelvic region were inflicted either contemporaneous with death or sometime thereafter. This testimony and the basic facts of the case demonstrate that there was no intervening period between the assault on the victim's head and upper torso and the assault on her lower body; instead, it shows that the infliction of the injuries to the victim's vagina and rectum were part of a continuing series of assaults. In addition, the assault on the victim's upper body and the external injuries in the pelvic region show that force was used in getting the victim to submit to the act.

If the evidence had showed that the mutilation of the lower body took place substantially after the victim had died, appellant could legitimately argue that the assault constituted only an abuse of a corpse. However, taken as a whole, the evidence supports the finding that while the victim was still living, force was employed to compel the victim to submit to the act. As the *Collins* court emphasized, the mere fact that the victim might have been dead by the time the penetration occurred does not detract from appellant's culpability.

■ As a result, this court holds that under the facts of this case, the state was required to show that the victim was alive when the series of assaults began which ultimately resulted in the act of sexual penetration charged. It was not required to show that she was still alive at the completion of the sequence of events. Appellant's eighth assignment is accordingly without merit.

\* \* \* 3

The judgment of the trial court is affirmed.

*Judgment affirmed.*

O'NEILL, J., concurs.

FORD, J., concurs in judgment only.

JOSEPH E. O'NEILL, J., of the Seventh Appellate District, sitting by assignment.

FORD, Judge, concurring in judgment only.

Although I concur with the conclusions obtained by the majority, I do not share in its analysis in the second \* \* \* and eighth assignments of error.

In the second assignment, given the state of the record before this court, and the testimony of the officer on this subject, I feel this cause does not

---

**3.** See fn. 1.

present the appropriate basis upon which to so thoroughly analyze the issue as to adopt the *Thompson* analysis to determine whether an accused has waived his right to counsel.

Here, the officer merely informed appellant that he was not in a position to tell appellant if he needed counsel, and that it was appellant's decision to make. The officer then testified that appellant executed the waiver. Absent here is any request for counsel, by appellant, let alone any *Thompson* inquiry on the subject of clarifying that request. There appears to be no real basis to determine whether *Thompson* is applicable or if the officer complied with the dictates of that case.

\* \* \*

For these reasons, I concur in judgment only.