2002 UT 4

**STATE of Utah, Plaintiff and Appellee,**

v.

**Taberone Dave HONIE, Defendant and Appellant.**

No. 990497.

Supreme Court of Utah.

Jan. 11, 2002.

Mark L. Shurtleff, Att'y. Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Stephen R. McCaughey, Salt Lake City, for defendant.

WILKINS, Justice.

¶ 1 Defendant Taberone Dave Honie was convicted of aggravated murder, in violation of section 76–5–202 of the Utah Code, and sentenced to death. On appeal, he challenges the constitutionality of Utah's aggravated murder statute, the sufficiency of the evidence introduced at trial to support his conviction, and the trial judge's weighing of the aggravating and mitigating factors in sentencing him to death. Defendant also asks for a proportionality review and requests that a de novo standard of review be applied to all death penalty cases. We affirm the judgment and sentence of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Boyd,* 2001 UT 30, ¶ 2, 25 P.3d 985 (internal quotations and citations omitted).

¶ 3 On July 9, 1998, defendant Taberone Dave Honie killed Claudia Benn. Between approximately 8:00 and 8:30 p.m. on July 9, defendant telephoned Carol Pikyavit—the mother of defendant's child, T.H., and the daughter of the victim, Claudia Benn. Defendant was intoxicated and asked Carol to join him at the home of his girlfriend at the time, Shilo John. Carol refused and told defendant she was going to work. Defendant responded by threatening to kill Carol's mother, Claudia, and the children of Carol's sister, Benita. He also threatened to take T.H. from Carol. Carol discounted defendant's threats because he had threatened her life before. Defendant called twice more before Carol left for work at 10:30 p.m., and the caller identification system recorded one more phone call from Shilo John's residence after Carol left for work. Carol left T.H., and Benita left her two children, D.R. and T.R., with Claudia that evening when they went to work. The children were dressed and ready for bed when they left.

¶ 4 Later that evening, around 11:20 p.m., a cab driver picked up defendant. Although defendant was intoxicated, he directed the cab driver to an apartment complex near the victim's neighborhood where he got out.

¶ 5 Later on, at approximately 12:20 a.m., several police officers arrived at the victim's home in response to a 911 call from a neighbor. Upon arrival, the officers discovered that a sliding glass door in the rear of the house had been broken by a rock, with the glass substantially removed to permit access to the house. The police ordered the occupants inside the house outside, and the defendant was encountered exiting the house through the garage. Defendant was covered in blood and stated to the officers that he killed the victim by stabbing her with a knife.

Defendant was arrested, and the officers inspected the house.

¶ 6 Inside the house police officers discovered the victim's body partially nude, lying face down in the living room. A telephone was in her left hand and a large bloodstained kitchen knife was lying near her head. Blood had pooled on the carpeted floor underneath her neck, and blood was located on her exposed buttocks, on her lower body, and on the floor near her. One bite mark was identified on the victim's left arm. Drops of blood were found throughout the house: on the kitchen floor, on kitchen drawers, on the bathroom floor, in the bathroom sink, and on the walls near the bathroom and where the body was found. Blood was also smeared on closet doors.

¶ 7 One of the officers found the three children inside the house. Two of the three children had some blood on them, and the other child, D.R., was covered with blood. Further, D.R. was found wearing only a t-shirt; she was not wearing the panties she was wearing when her mother left for work. D.R.'s panties were recovered, and blood found on them was eventually determined to be D.R.'s. D.R. was given new panties the night of the murder, but she continued to bleed into the new panties. At trial, expert testimony indicated that the source of the bleeding, abrasions to her genital area, was consistent with rubbing or fondling, and not likely accidental. Following the trial, during the sentencing proceeding, defendant's expert witness, Dr. Nancy Cohn, testified that defendant admitted to her that he sexually molested D.R. by digitally penetrating her.

¶ 8 The postmortem examination of the victim's body revealed that defendant brutally slit the victim's throat. Defendant had cut the victim's neck from ear to ear. Four "start marks" on her neck ran together into a deep cut from the front of the neck through to the backbone in the back of the neck. Three deep cuts into the backbone were identified.

¶ 9 Defendant also mutilated the victim's lower body, stabbing and cutting her multiple times both in and around the vagina and

anus. Defendant stabbed the victim in the vagina at least three times. The external surfaces of the anus were cut, but the deeper penetrating injuries were in the vagina, including two wounds that went through the vagina and into the pelvic cavity in her abdomen. Defendant also severed the perineum, the band of tissue between the back wall of the vagina and the front wall of the anus. The medical examiner who performed the autopsy testified that the victim could have been sexually violated prior to death, but she could not testify for certain, however, whether the injuries to the victim's vagina and anus were inflicted before or after the injuries to the neck, or whether the vaginal and anal injuries occurred prior to or after death. While minimal compared to the above injuries, the victim's scalp, mouth, and buttocks were also bruised.

¶ 10 Over the course of three interviews with law enforcement officers on the morning of July 10, defendant admitted he had argued with the victim, yelling through the sliding glass door. Defendant confessed to using a rock to break the door and enter the house. Further, defendant told officers that he attempted to penetrate the victim's anus with his penis.

¶ 11 Defendant was charged with aggravated murder, in violation of section 76–5–202 of the Utah Code,[1] and convicted of the same by a jury. Defendant waived his right to a jury at the sentencing phase and was sentenced to death by the trial judge.

¶ 12 During the sentencing phase, both the defendant and the State presented testimony. Evidence was presented regarding, among other things, the crime itself, defendant's character, background, history, mental and physical condition, the victim, and the impact on the victim's family and community. The trial judge entered a written Statement of Conviction and Judgment of Death, outlining the evidence he received and weighed.

## ANALYSIS

### I. STANDARD OF REVIEW

¶ 13 Defendant proposes that all issues on appeal in death penalty cases be reviewed de

---

1. The first information was filed on July 10, 1998, the day after the incident. An amended information was filed on September 18, 1998.

novo, particularly the sufficiency of the evidence issue. The State argues that because none of the issues raised by defendant on appeal were adequately raised before the district court and preserved for appeal, they are subject to review under the manifest and prejudicial error standard.

¶ 14 We decline to adopt defendant's suggestion to review all issues in death penalty cases de novo simply because the sentence is death. Our judicial system is structured so that appellate courts review decisions of lower courts; it is not geared toward appellate review as a second trial. Appellate courts are not suited to reviewing particular issues de novo. See, e.g., State v. Peña, 869 P.2d 932, 935–40 (Utah 1994) (discussing why factual issues require the deferential clearly erroneous standard of review and why some mixed questions of law and fact require that some measure of deference be given to the trial court).

¶ 15 Only one of the issues raised on appeal was properly presented to the trial court and thereby preserved for appeal.[2] As a general rule, in order for an appellate court to review contentions of error on appeal, the errors must be objected to or be preserved in the trial court record. In death penalty cases, however, due to the nature of the penalty, we have recognized an exception to the general rule. In State v. Wood, this Court articulated the exception as follows: "On direct appeal in capital cases, it is the established rule that this Court will review an error, even though no proper objection was made at trial and even though the error was not raised on appeal, if the error was manifest and prejudicial." 648 P.2d 71, 77 (Utah 1982). Since Wood we have continued to adhere to this rule. See, e.g., State v. Lafferty, 2001 UT 19, ¶ 96, 20 P.3d 342; State v. Tillman, 750 P.2d 546, 552 (Utah 1987) ("Tillman I"). Because this is a death

penalty case, we review the issues not raised below for manifest and prejudicial error.

¶ 16 We further note, however, that while we review under this manifest and prejudicial error standard, we do not abrogate defendant's obligation or assume the role of an advocate by searching the entire record for each and every indication of possible or potential error. Lafferty, 2001 UT at ¶ 96, 20 P.3d 342 (citing Tillman I, 750 P.2d at 552). To do so would result in an impossible and inappropriate burden on this Court. Id. Indeed, "neither Wood nor its progenitors support the contention that this Court will review the entire record for error, whether or not preserved at trial or assigned on appeal." Rather, our precedent upholds the well-established proposition that "we have the sua sponte prerogative in [death penalty] cases to notice, consider, and correct manifest and prejudicial error which is not objected to at trial or assigned on appeal, but is palpably apparent on the face of the record." Tillman I, 750 P.2d at 552–53; see also, e.g., Lafferty, 2001 UT at ¶ 96, 20 P.3d 342. It is with this background in mind that we review defendant's contentions of error.

## II. CONSTITUTIONALITY OF UTAH'S AGGRAVATED MURDER STATUTE

¶ 17 Defendant claims the subsection of the aggravated murder statute under which he was convicted, Utah Code Ann. § 76–5–202(1)(d) (1999) (amended 2001), is unconstitutional because it substantially overlaps with the felony murder statute, Utah Code Ann. § 76–5–203(1)(d) (1999) (amended 2000). He also asserts that this legislation fails to channel the death sentencer's discretion or narrow the class of death-eligible murders. He further claims that the aggravated murder statute is vague, contains equal protection problems, and leaves too much discretion

---

2. Before the trial court the defendant challenged the constitutionality of Utah's Death Penalty scheme as (1) violative of the Eighth Amendment as cruel and unusual punishment and because it allegedly shifts the burden of proof to the defendant; (2) violative of due process and equal protection because it serves no compelling state interest and because it fails to narrow the class of persons eligible for the death penalty; (3) violative of article I, section 7, and article I, section 9,

of the Utah Constitution; and (4) violative of his "right to a fair sentencing hearing." Except for his argument that Utah's statutory scheme unconstitutionally fails to channel sentencing discretion by failing to narrow the class of persons who are eligible for the death penalty, defendant did not raise before the trial court and properly preserve the constitutional and other issues he raises now on appeal.

with the prosecutor. Even further, in his second supplemental brief, defendant contends the alleged statutory overlap violates article I, section 24 of the Utah Constitution, the provision requiring "all laws of a general nature [to] have uniform operation." The State counters each of defendant's contentions. The State maintains that these statutes do not unconstitutionally overlap because they each have different mens rea requirements. The State also professes that the statute is not vague because it provides sufficient notice of the elements of aggravated murder, and that the statute sufficiently channels prosecutor discretion. We address each issue seriatim.

¶ 18 We note initially that in assessing the constitutionality of legislation, we begin with the presumption of constitutionality; the act is presumed valid, and we resolve any reasonable doubts in favor of constitutionality. *E.g.*, *Soc'y of Separationists v. Whitehead*, 870 P.2d 916, 920 (Utah 1993); *see also State v. Gardner*, 947 P.2d 630, 645 (Utah 1997) (explaining that in Eighth Amendment challenges a "heavy burden rests on those who would attack the judgment of the representatives of the people" (quoting *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))).

## A. No Equal Protection Violation because of Overlap

¶ 19 Defendant claims section 76–5–202 is unconstitutional because it substantially overlaps with section 76–5–203, creating an equal protection problem under *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146 (Utah 1969). Inasmuch as this issue was not before the trial court and properly preserved, we review for manifest and prejudicial error. *See, e.g., State v. Lafferty*, 2001 UT 19, ¶ 96, 20 P.3d 342; *State v. Holgate*, 2000 UT 74, ¶¶ 11–13, 10 P.3d 346. We conclude that section 76–5–202 does not unconstitutionally overlap with section 76–5–203.

¶ 20 Section 76–5–202 reads, in relevant part, "(1) Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the following circumstances." The remainder of subsection (1) lists the aggravating factors that must be proved for a homicide to constitute aggravated murder. The aggravating factor that defendant claims unconstitutionally overlaps with the felony murder statute reads:

(d) the homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, forcible sexual abuse, sexual abuse of a child, aggravated sexual abuse of a child, child abuse of a child under the age of 14 years as otherwise defined in Subsection 76–5–109(2)(a), or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, kidnapping, or child kidnapping;

Utah Code Ann. § 76–5–202(1)(d) (1999) (amended 2001). Defendant claims this subsection unconstitutionally overlaps with the felony murder provision of section 76–5–203 which reads, in relevant part:

(1) Criminal homicide constitutes murder if the actor:

. . . .

(d) while in the commission, attempted commission, or immediate flight from the commission or attempted commission of aggravated robbery, robbery, rape, object rape, forcible sodomy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, kidnapping, child kidnapping, rape of a child, object rape of a child, sodomy upon a child, forcible sexual abuse, sexual abuse of a child, aggravated sexual abuse of a child, or child abuse, as defined in Subsection 76–5–109(2)(a), when the victim is younger than 14 years of age, causes the death of another person other than a party as defined in section 76–2–202;

Utah Code Ann. § 76–5–203 (1999) (amended 2000).

¶ 21 Certainly, as we said in *Shondel*, "the equal protection [clause] requires that [our laws] affect alike all persons similarly situated." 453 P.2d at 147. Nevertheless, this case does not violate the equal protection clause because the statutory elements of felo-

ny murder under section 76–5–203 are different from the elements of aggravated murder under section 76–5–202, and therefore violators of the respective crimes are not similarly situated.

¶ 22 One variable of the two crimes does overlap. Each of the aggravating factor elements of the aggravated murder statute found in subsection 76–5–202(1)(d) is also an underlying felony for felony murder in subsection 76–5–203(1)(d), albeit the common factors are listed in a different order. However, an individual convicted of aggravated murder and an individual convicted of felony murder are not similarly situated. The statutes as a whole outline clearly different crimes, and the common variable combines differently with the other elements of the two different criminal equations of aggravated murder and felony murder. The two crimes have different mens rea requirements, and they contain other distinct elements.

¶ 23 First, even though portions overlap, the elements of aggravated murder and felony murder as outlined by the two statutes are different; they have different mens rea requirements, and they contain other different requirements. The elements of aggravated murder under section 76–5–202 are three: (1) a homicide, "the death of another," the actus reus; (2) committed "intentionally or knowingly," the mens rea; (3) plus an aggravating factor. The elements of felony murder under subsection 76–5–202(1)(d) are clearly different: (1) a "criminal homicide," the actus reus; (2) committed while in the commission, attempted commission, or immediate flight from the commission or attempted commission of one of several factors. The aggravated murder provision requires that the common felonies be committed intentionally or knowingly, while the felony murder provision, on the other hand, requires only that a homicide occur in conjunction with the commission, attempt, or flight from the commission or attempt of one of the common felonies.

¶ 24 Second, while it is true that these two statutes share common factors, the fact that these two statutes share a common variable does not mean, however, that the statutes as a whole contain the same elements such that they unconstitutionally overlap. The common variable combines differently with the other elements of the respective crimes. Aggravated murder under subsection 76–5–202(1)(d) focuses on the homicide, requiring that the homicide be committed intentionally or knowingly, and that one of the common felonies occur concurrently. Subsection 76–5–203(1)(d), on the other hand, focuses on the enumerated felony, declaring that a homicide constitutes murder if it occurs while the actor commits, attempts to commit, or flees from the commission or attempted commission of one of the various common felony factors. Thus, while the two statutes contain portions that are the same, the common portions combine differently with other elements within the respective crimes, and the common factors are part of different criminal equations.

¶ 25 Defendant also asserts that section 76–2–102 mandates that intent, knowledge, or recklessness must be imposed as the mens rea for the felony murder statute because subsection 76–5–203(1)(d) does not expressly specify a "culpable mental state," or mens rea requirement.[3] We disagree; the felony murder statute does contain a culpable mental state. In *State v. McCovey*, this court stated that "[t]he traditional common law purpose of the felony murder doctrine has been to allow the State to obtain a second degree murder conviction without proving any form of mens rea, or mental state." 803 P.2d 1234, 1238 (Utah 1990). The court further stated that felony murder is, "[i]n essence, … a strict liability offense." *Id.* In the same paragraph the court indicated that the required mens rea was not the mental state regarding whether the felon intended to commit murder. *Id.* We clarify here that

---

**3.** "Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility. An offense shall involve strict liability if the stat-

ute defining the offense clearly indicates a legislative purpose to impose criminal responsibility for commission of the conduct prohibited by the statute without requiring proof of any culpable mental state." Utah Code Ann. § 76–2–102 (1999).

although felony murder under section 76–5–203(1)(d) does not require that a mens rea requirement correspond to the ͨhomicide, the crime of felony murder does require proof of a culpable mental state; the culpable mental state is the mens rea associated with the underlying charged felony. This comports with the more widely accepted understanding regarding felony murder, that while the intent to cause the homicide is not a requirement, i.e., the homicide may be accidental, it is the legal mens rea from the underlying felony that transforms a homicide into felony murder. *See generally,* 40 Am.Jur.2d *Homicide* § 64; 40 C.J.S. *Homicide* § 46; *see also, e.g., Mares v. State,* 939 P.2d 724, 729 (Wyo. 1997) (explaining the Wyoming felony murder statute). As a result, we declare that section 76–2–102 does not impose a mens rea requirement of intent, knowledge, or recklessness on subsection 76–5–203(1)(d) because the culpable mental state for felony murder is the mens rea included in the underlying felony outlined in subsection 76–5–203.

## B. *No Constitutional Violation for Failure to Channel Sentencing Discretion*

¶ 26 Defendant's argument that Utah's statutory scheme unconstitutionally overlaps because it fails to channel the capital sentencer's discretion also fails. This issue was properly preserved. We therefore review for correctness, giving no deference to the trial court. *See, e.g., State v. Mohi,* 901 P.2d 991, 995 (Utah 1995) (explaining that the constitutionality of a statute is a question of law reviewed for correctness).

¶ 27 In *State v. Young* we held that so long as the initial narrowing of death-eligible defendants occurs at the guilt phase in Utah's statutory scheme, any expanded consideration of factors at sentencing is constitutional. 853 P.2d 327, 352 (Utah 1993); *see also State v. Lafferty,* 2001 UT 19, ¶ 134, 20 P.3d 342. With respect to the statutory scheme applicable to defendant, the narrowing of death-eligible defendants occurs at the guilt phase, *see* Utah Code Ann. §§ 76–5–202, 76–3–206, and 76–5–203, and therefore we reject defendant's argument.

## C. *No Unconstitutional Prosecutorial Discrimination*

¶ 28 Defendant argues that the charge of aggravated murder in this case was not justified and that the prosecutor charged him with aggravated murder for racially discriminatory reasons. He cites *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), in support. Inasmuch as this issue was not before the trial court and properly preserved, we review for manifest and prejudicial error. *See, e.g., State v. Lafferty,* 2001 UT 19, ¶ 96, 20 P.3d 342; *State v. Holgate,* 2000 UT 74, ¶¶ 11–13, 10 P.3d 346.

¶ 29 First, this case is unlike *Yick Wo.* In *Yick Wo,* the Court indicated that although laws may be fair and impartial on their face, they may be unconstitutional as applied if administered in such a way so as to cause unjust and illegal discriminations between persons in similar circumstances. *Yick Wo,* 118 U.S. at 374, 6 S.Ct. 1064. In this case, defendant has offered no indication that he was treated any differently than another person of a different race or ethnicity in similar circumstances. Plus, while the prosecutor's racially-related comments made during closing argument, *see infra* ¶ 38, were clearly offensive and distasteful, the charge of aggravated murder was supported and proved by the evidence, regardless of defendant's race or ethnicity. We do not find any manifest or prejudicial error.

## D. *Not Void–for–Vagueness*

¶ 30 Defendant contends that the alleged statutory overlap creates a constitutional vagueness problem, resulting in unfettered prosecutorial discretion regarding which crime to charge. This argument also fails. Inasmuch as this issue was not before the trial court and properly preserved, we review for manifest and prejudicial error. *See, e.g., State v. Lafferty,* 2001 UT 19, ¶ 96, 20 P.3d 342; *State v. Holgate,* 2000 UT 74, ¶¶ 11–13, 10 P.3d 346.

¶ 31 The void-for-vagueness doctrine requires criminal legislation to sufficiently define prohibited conduct such that (1) it provides the kind of notice that enables ordinary people to understand what conduct it

prohibits; and (2) it does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Failure to meet either standard may result in the invalidation of the legislation. *Id.*

¶ 32 First, aggravated murder and felony murder are clearly defined in the respective statutes such that ordinary people can understand and are on notice of the prohibited conduct. As we explained above, portions of the two statutes do overlap. However, simply because elements of the different crimes overlap does not mean that the statutes are so vague that the public is unaware of what constitutes unlawful behavior. Again, the overlapping provisions combine differently with other elements within the respective crimes, and the common factors are part of different criminal equations. Thus, the two statutes provide notice of distinctly different criminal conduct; each statute provides sufficiently clear and understandable notice to the ordinary citizen as to the conduct that is prohibited as aggravated murder and the conduct that is prohibited as felony murder. Consequently, neither the aggravated murder statute nor the felony murder statute are vague on their face. *See, e.g., State v. James*, 819 P.2d 781, 796 (Utah 1991) (citing *State v. Pilcher*, 636 P.2d 470, 471 (Utah 1981)).

¶ 33 Second, defendant has not offered how the legislation encourages arbitrary and discriminatory enforcement; he simply claims that the legislation left it up to the prosecutor to decide whether to prosecute defendant for a capital or non-capital offense. It is unavoidable in our criminal justice system not to have someone decide whether the State has sufficient evidence to convict a defendant of a capital or non-capital crime. Consequently, "[w]e have repeatedly considered and upheld the constitutionality of the death penalty scheme [in Utah], holding that it allows neither too much prosecutorial discretion nor unguided prosecutorial discretion in determining to seek the death penalty." *State v. Lafferty*, 2001 UT 19, ¶ 141, 20 P.3d 342 (citations omitted). Moreover, in this case, the aggravated murder and felony mur-

der statutes set forth different standards of criminally prohibited conduct, and the prosecutor chooses whether the State has sufficient evidence to satisfy different elements of distinct crimes. The prosecutor specifically decides whether the homicide occurred while in the commission, attempted commission, or flight from the commission or attempt of a felony, or whether the homicide was committed intentionally or knowingly. We remain unconvinced that the statutory scheme encourages arbitrary and discriminatory enforcement.

### E.   Uniform Operation of the Laws

■ ¶ 34 Defendant's claim that the statutes in question violate the Uniform Operation of the Laws[4] provision in the Utah Constitution also fails. He cites *State v. Mohi*, 901 P.2d 991 (Utah 1995), in support of his contention that the statutory overlap creates a scheme that "risks uneven application of the laws." He claims article I, section 24 is violated because the aggravated murder and felony murder statutes contain fungible elements, and, as a result, they classify and treat the "death-eligible felony murder defendants" differently from similarly situated "non-death-eligible felony murder defendants." Inasmuch as this issue was not before the trial court and properly preserved, we review for manifest and prejudicial error. *See, e.g., State v. Lafferty*, 2001 UT 19, ¶ 96, 20 P.3d 342; *State v. Holgate*, 2000 UT 74, ¶¶ 11–13, 10 P.3d 346. We are not convinced by defendant's argument.

■ ¶ 35 In analyzing whether laws have uniform operation under article I, section 24, Utah's uniform operation of laws provision, we assess whether the law is applied uniformly to persons similarly situated. *Mohi*, 901 P.2d at 997. In doing so, we may look to whether the statute applies equally to all persons within a class, and whether the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute. *Id.* (citations omitted). We conclude, for the

---

4. Article I, section 24 of the Utah Constitution states, "All laws of a general nature shall have

uniform operation."

reasons outlined previously—the statutes as a whole outline clearly different crimes, the common variable combines differently with the other elements of the two different criminal equations of aggravated murder and felony murder, the two crimes have different mens rea requirements, and they contain other distinct elements—that defendants convicted of felony murder and aggravated murder under Utah's statutes are not similarly situated, and they are not part of the same class. Because a person convicted of felony murder is not part of the same class or similarly situated to a person convicted of aggravated murder, we therefore need not analyze whether the laws are applied equally to them or whether they receive different treatment. Article I, section 24 is not violated.

## III. PROPORTIONALITY REVIEW

¶ 36 In addition to the prior constitutional issues based on the overlapping portions of the two statutes, defendant raises a constitutional issue based on the Eighth Amendment. Defendant asserts that his sentence of death is disproportionate to his culpability and is the result of invidious discrimination against him as a member of the Hopi Native American Indian Tribe. The State contends that this issue is not properly before this court, and that even if it is, proportionality review is not constitutionally required. The State further advocates that if this court decides to conduct a proportionality analysis, defendant's sentence is not disproportionate to his culpability and not outside of the general pattern of death penalty cases in Utah.

¶ 37 As we recently noted in *State v. Lafferty*, "proportionality review is not required under the federal constitution or under our state constitution." 2001 UT 19, ¶ 114, 20 P.3d 342 (citations omitted). Despite the fact that proportionality review is not required, either by the Utah or federal constitutions or by statute, we have chosen to assume the responsibility of reviewing death sentences for disproportionality. *Id.* at ¶ 115 (citing *State v. Holland*, 777 P.2d 1019, 1025–26 (Utah 1989)). As we did in *Lafferty*, we review defendant's death sentence generally to prevent disproportionality, considering (1) whether the death penalty was imposed in an invidious fashion against a particular group

of people, (2) whether the death penalty was proportionate to defendant's level of culpability, and (3) whether defendant's sentence was in proportion to the general pattern of cases in our state. *Id.; see also Holland*, 777 P.2d at 1025–26.

### A. No Invidious Imposition Against a Particular Group

¶ 38 Defendant claims his sentence is the result of invidious discrimination against him as a member of the Hopi Native American Indian Tribe. He claims certain statements made by the prosecutor to the judge during the penalty phase demonstrate that discrimination occurred in sentencing. The prosecutor's language now objected to by the defendant on appeal is as follows:

(3) The victim and the impact of the crime on the victim's family and community without comparison to other persons or victims. Ah, he did not murder a drunken Indian in the park in Cedar City. He did not murder a woman who, ah, had spent her li[f]e drinking alcohol and puking and walking the streets and shoplifting at Wal–Mart. He murdered someone that these people look up to. He murdered a superstar in the Piute community and much like Mr. Hoosava that worked hard to get his bachelor's degree and two-year substance degree and return to the people, she returned to her people. And the law, not emotion, the law allows for you to take into account who the victim was, and Claudia Benn was a great person in our community and a great person in the Piute community.

These comments could reasonably be inferred as pejorative of persons of Native American descent, comments that are demeaning, offensive, and clearly improper. That said, in imposing sentence the sentencing judge did not consider these comments or defendant's ethnicity as a factor. The court explained:

While not objected to by the defense, the court notes that such a comparison is impermissible under the statute and case law, and was not undertaken by the court in reaching its decision. The court's decision on sentencing would have been the same

had the victim been "a drunken Indian in the park" or a drunken white man in the park, or a sober doctor in his office, etc. Each human life is of equal value. The murder of any victim under the circumstances of this case, no matter what that victim[']s status, would have been just as painful, traumatic, and reprehensible, and would require the same punishment.

¶ 39 The sentencing judge's handling of the matter, combined with the facts of this case, convince us that defendant's sentence was not imposed in an invidious fashion against a particular group of people. First, the language of the prosecutor references the ethnicity of the victim, not the ethnicity of the defendant, and it does not demonstrate invidious discrimination by the sentencing judge. While the statement complained about by the defendant reflects the prosecutor's insensitivity, it does not evidence that the trial judge invidiously discriminated against members of the Hopi Tribe in sentencing defendant. The statement does not even demonstrate that the court took defendant's ethnicity into account in imposing sentence. Second, even if the prosecutor's statement is read as implying that defendant's ethnicity should be considered in imposing sentence, the trial judge clearly explained that death was imposed without giving any weight to ethnicity. The trial judge expressly condemned the statement of the prosecutor and expressly disregarded ethnicity as a sentencing factor. Defendant's sentence was imposed because defendant's actions in this case satisfy the elements of aggravated murder—a crime for which death is a sentencing alternative—and because the sentencing judge concluded, beyond a reasonable doubt, that the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances, and because the imposition of the death penalty is justified and appropriate given defendant's conduct. Defendant's sentence was not imposed in an invidious fashion against a particular group of people.

### B. Proportionate to Level of Culpability

■ ¶ 40 Defendant's sentence is not disproportionate to his level of culpability. The jury found defendant guilty of aggravated murder, and the legislature has declared that aggravated murder is eligible for the death penalty. Presented with only an appellate record, we are not in a position to determine whether defendant is extremely culpable or just somewhat culpable. The body asked to evaluate defendant's level of culpability, however, was convinced, beyond a reasonable doubt, that defendant was guilty of aggravated murder. Regardless of whether one agrees with the legislature's categorization of conduct eligible for aggravated murder, the crime of aggravated murder is eligible for the death penalty. Therefore, viewing the conclusion of the jury that defendant was guilty beyond a reasonable doubt of aggravated murder in light of the legislative policy that death is not a disproportionate punishment for aggravated murder, defendant's sentence is not disproportionate to his culpability.

### C. Proportionate When Compared to Other Death Penalty Cases

■ ¶ 41 In presenting his proportionality argument, defendant emphasizes State v. Holland, in which this court stated, "[w]ith few exceptions, juries in this state have not opted for death penalties when a defendant has committed only a single murder; for the most part death penalties have been imposed when the defendant was involved in multiple murders, either at the time of the particular homicide charged or at some other time." 777 P.2d 1019, 1025–26 (Utah 1989). This statement does not necessarily mean, however, that the death sentence is disproportionate because a number of juries have not opted for death where the defendant was convicted of one murder. In fact, to the contrary are more than a few exceptions, some far less heinous than the instant case, in which defendants convicted of "only a single murder"—an unfortunate phrase—have been sentenced to death. See, e.g., State v. Lovell, 1999 UT 40, 984 P.2d 382; State v. Menzies, 889 P.2d 393 (Utah 1995); State v. Carter, 888 P.2d 629 (Utah 1994); State v. Archuleta, 850 P.2d 1232 (Utah 1993); State v. Taylor, 818 P.2d 1030 (Utah 1991); State v. Gardner, 789 P.2d 273 (Utah 1989); State v. Parsons, 781 P.2d 1275 (Utah 1989); State v. Redford, 27 Utah 2d 379, 496 P.2d 884 (Utah 1972); State v. Poulson, 14 Utah 2d

213, 381 P.2d 93 (Utah 1963); *State v. Rivenburgh*, 11 Utah 2d 95, 355 P.2d 689 (Utah 1960); *State v. Neal*, 123 Utah 93, 254 P.2d 1053 (Utah 1953); *State v. Trujillo*, 120 Utah 320, 233 P.2d 701 (Utah 1951). Plus, it is clear under our statutory scheme that multiple murders are not required before death is an available sentence. Utah Code Ann. § 76–5–202(1)–(2) (1999) (amended 2001) (delineating the conduct that qualifies as aggravated murder and defining aggravated murder as a capital offense); Utah Code Ann. § 76–3–206 (1999) (amended 2001) (declaring that capital felonies are death-eligible).

¶ 42 In short, this case is not so far outside the general pattern of death penalty cases to constitute an anomaly; our legislation permits death for a single murder and defendant is not the first to have been sentenced to death for a single murder in Utah.

## IV. SUFFICIENCY OF THE EVIDENCE

¶ 43 Defendant alleges that the jury lacked sufficient evidence to conclude he was guilty of aggravated murder, specifically that the State failed to offer sufficient expert testimony that the alleged sexual aggravating factors of object rape, forcible sodomy, and aggravated sexual assault occurred before the victim expired. The State counters that regardless of whether the evidence is sufficient regarding the sexual aggravating factors, the conviction may be affirmed based on uncontested aggravating factors, particularly the burglary and aggravated burglary factors. The State also argues that whether the victim was alive when defendant committed the sexual aggravating factors is irrelevant.

¶ 44 Defendant claims this issue was raised below and preserved when defense counsel "attacked the sufficiency of the evidence of the aggravating factors" during closing argument. This does not satisfy the rule. *See State v. Holgate*, 2000 UT 74, ¶¶ 11, 14, 10 P.3d 346 (explaining the preservation requirement and stating, "As a general rule, to ensure that the trial court addresses the sufficiency of the evidence, a defendant must request that the court do so."). Consequently, we review defendant's contention generally for manifest and prejudicial error. We further note that in consid-

ering an insufficiency-of-evidence claim, we review the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. *State v. Dunn*, 850 P.2d 1201, 1212 (Utah 1993) ("We reverse a jury verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted.") (citations omitted). We do not re-evaluate the credibility of witnesses or second-guess the jury's conclusion; we determine only whether sufficient competent evidence was admitted to satisfy each element of the charge, whether sufficient evidence was before the jury to enable it to find, beyond a reasonable doubt, that the defendant committed the crime. *State v. James*, 819 P.2d 781, 784 (Utah 1991) (citing *State v. Warden*, 813 P.2d 1146, 1150 (Utah 1991)).

¶ 45 We begin with the elements of aggravated murder. The first part of the statute reads, "(1) Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another under any of the following circumstances." Utah Code Ann. § 76–5–202 (1999) (amended 2001). The rest of the statute consists of a list of aggravating factors, one of which reads:

> (d) the homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, forcible sexual abuse, sexual abuse of a child, aggravated sexual abuse of a child, child abuse of a child under the age of 14 years, as otherwise defined in Subsection 76–5–109(2)(a), or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, kidnapping, or child kidnapping.

Utah Code Ann. § 76–5–202(1)(d) (1999) (amended 2001).

¶ 46 The State contends that defendant intentionally or knowingly caused the death of Claudia Benn while engaged in the commission of, or an attempt to commit, or flight

after committing or attempting to commit, rape, object rape, forcible sodomy, sexual abuse of a child, aggravated sexual abuse of a child, aggravated sexual assault, aggravated burglary, or burglary. Thus, the State was required to put forth sufficient evidence to support a conclusion that (1) defendant killed the victim, the actus reus, (2) defendant did so intentionally or knowingly, the mens rea, and (3) defendant's conduct also falls within the description of one or more aggravating factors.

¶ 47 The evidence is not so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant satisfied these elements and committed the crime of aggravated murder. Defendant's threat to kill the victim and Benita's children, and his confession to police officers that he killed the victim by stabbing her with a knife are, without a doubt, sufficient to support the mens rea and actus reus requirements, respectively. This evidence is clearly sufficient to satisfy the murder element of the aggravated murder conviction.

¶ 48 The question therefore is whether the State presented sufficient evidence to support one or more of the aggravating factors. We conclude that it did.

¶ 49 First, the evidence admitted at trial is sufficient to support the aggravating factors of object rape and aggravated sexual assault challenged by defendant as insufficient. Defendant claims these aggravating factors are unsupported, claiming the State failed to prove the victim was still alive when raped. This contention is belied by the expert testimony, however. The only expert to testify regarding whether the mutilation of the victim's genital and anal areas occurred before or after the victim expired was Dr. Maureen Frikke, the medical examiner who performed the autopsy. Defendant professes that because Dr. Frikke testified that she could not determine the sequence of the throat injuries and lower body injuries, and that because she acknowledged that she could not "tell for certain whether the victim was alive or dead when the vaginal injuries occurred," there is insufficient evidence to support the aggrava-

ting factors of object rape and aggravated sexual assault. To the contrary, however, is Dr. Frikke's testimony that the stabbing wounds to the victim's anal and vaginal areas could have been caused before she died. In fact, in response to the question, "Do you know—could [the victim] have been violated sexually antemortem, before she died?" Dr. Frikke responded, "Yes." While the jury could have found that the wounds to the victim's lower body could have been inflicted after she expired, they found otherwise. The jury found that the homicide was committed while defendant was engaged in the commission of, or an attempt to commit object rape, forcible sodomy, and aggravated sexual assault. Defendant may disagree with the finding, but there was sufficient evidence for the jury to so find.

¶ 50 Second, even if we were not to consider whether the alleged sexual aggravating factors were committed on the victim while she was alive, the evidence is undoubtedly sufficient to support the aggravating factors of burglary and aggravated burglary. Defendant confessed to using a rock to break the sliding glass door and enter the house. This alone is sufficient to satisfy the aggravating factors of burglary or aggravating burglary. *See* Utah Code Ann. §§ 76–6–202 (1999) (amended 2001) (burglary); 76–6–203 (1999) (amended 2000) (aggravated burglary). Even further, defense counsel acknowledged in closing argument during the guilt phase that defendant was guilty of aggravated murder due to the burglary.

¶ 51 In sum, given Dr. Frikke's testimony regarding the injuries, combined with defendant's admissions—that he used a rock to break into the victim's home where he stabbed her to death with a knife, both of which were properly before the jury—we conclude that the evidence presented was sufficient to support the conviction of aggravated murder.

### V. THE DISTRICT COURT'S APPLICATION OF THE *WOOD* FACTORS [5]

¶ 52 We are asked to review whether the aggravating and mitigating factors consid-

---

5. We note here that the *Wood* factors are more accurately the statutory guidelines or factors found in section 76–3–207, and that since *State v.* *Wood*, section 76–3–207 has been amended. *Compare State v. Wood*, 648 P.2d 71, 79 n. 4, *with*

ered by the trial judge were properly considered factors, and whether the factors were given the proper weight. The parties refer to *State v. Wood,* 648 P.2d 71 (Utah 1982), a case which explains how the aggravating and mitigating factors of section 76–3–207 of the Utah Code are analyzed.

¶ 53 Defendant argues the sentencing judge committed both factual and legal errors in determining and weighing the aggravating and mitigating factors. The State counters that the sentencing judge properly categorized factors as aggravating or mitigating and analyzed them appropriately. The State further contends that defendant, through counsel, admitted that the aggravating factors outweighed the mitigating factors, and therefore any error regarding this issue is harmless.

¶ 54 Because this issue was not properly preserved, we review generally for manifest and prejudicial error. Defendant claims this issue was properly raised below and preserved for appeal "when defense counsel argued against the imposition of the death penalty" in closing argument. Again, however, generally discussing the matter during closing argument does not give the trial court an opportunity to address and rule on the issue and thereby satisfy the obligation. We also note that this issue is a mixed question requiring application of the law to facts presented before the trial court. As a result, we review under the manifest and prejudicial error standard, but recognize the need to grant a certain measure of discretion to the trial judge. *See, e.g., State v. Daniels,* 2002 UT 2, ¶¶ 15–19, 40 P.3d 611; *State v. Peña,* 869 P.2d 932, 936–40 (Utah 1994). We further note that " '[a]n erroneous decision by a trial court "cannot result in reversible error unless the error is harmful." ' " *State v. Lafferty,* 2001 UT 19, ¶ 35, 20 P.3d 342 (quoting *State v. Robertson,* 932 P.2d 1219, 1227 (Utah 1997) (quoting *State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992))). An error is harmful if it is such that absent the error, there is a sufficiently high likelihood of a different outcome, undermining our confidence in the result. *Id.; see also Hamilton,* 827 P.2d at 240. Moreover, the burden of showing a sufficiently high likelihood of a

different outcome rests on the complaining party. *Id.* (citing, inter alia, *State v. Robertson,* 932 P.2d 1219, 1227 (Utah 1997)).

¶ 55 Aggravating factors, as a matter of federal constitutional law, must meet two requirements: "First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague." *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (citations omitted). That said, as we did in *Wood,* we analyze first whether any improper factors were weighed. Then, if the trial court erred in weighing an improper factor or factors, we evaluate whether the error is harmless, nonprejudicial error. *See Wood,* 648 P.2d at 85–86, 88 (setting aside a death sentence because three errors were prejudicial: an improper standard of persuasion was applied in the penalty phase, an improper aggravating factor was weighed, and the court failed to order a psychiatric examination for use in the penalty phase); *see also Jones v. United States,* 527 U.S. 373, 402, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (concluding that challenged aggravating factors were appropriate for a sentencer to consider, and then assuming that even if consideration of a factor was error, that the error was harmless).

### A. Object Rape and Aggravated Sexual Assault as Aggravating Factors

¶ 56 The trial court did not err in considering the aggravating factors of object rape and aggravated sexual assault. Defendant's contention, that these factors were inappropriately considered because the State did not provide sufficient evidence that the victim was alive when the injuries to her lower body were inflicted, fails. First, these two circumstances do not apply to every defendant convicted of a murder, and they are not unconstitutionally vague. Second, these two aggravating factors are permissible factors for consideration under the statute. *See* Utah Code Ann. §§ 76–3–207(3); 76–5–202(1)(d). Moreover, as we explained previously, sufficient evidence was admitted

Utah Code Ann. § 76–3–207 (1999) (amended 2001).

at trial to support a finding that the homicide was committed while the defendant was engaged in the commission of or attempt to commit object rape, forcible sodomy, and aggravated sexual assault; and indeed, the jury found as much.

## B. Aggravated Sexual Abuse of a Child as a Non–Statutory Aggravating Factor

¶ 57 Defendant contends that the trial court erred in considering the aggravating factor of aggravated sexual abuse of a child because the jury found that the homicide was not committed while he was engaged in the commission of or the attempt to commit aggravated sexual abuse of a child. We disagree.

¶ 58 We note initially that this circumstance does not apply to every defendant convicted of a murder, and it is not unconstitutionally vague.

¶ 59 Next, consideration of this factor was permissible under the statute. The version of section 76–3–207 applicable to defendant outlines what evidence, including aggravating and mitigating factors, may be presented in a sentencing proceeding. Beginning with subsection (2)(a), the statute states,

> In capital sentencing proceedings, evidence may be presented on: (i) the nature and circumstances of the crime; (ii) the defendant's character, background, history, mental and physical condition; (iii) the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims; and (iv) *any other facts in aggravation or mitigation that the court considers relevant to the sentence.*

Utah Code Ann. § 76–3–207(2)(a) (1999) (amended 2001) (emphasis added). In collecting all of the circumstances surrounding the crime and the characteristics and background of the defendant that are relevant to sentencing, the sentencing judge or jury may be presented with considerable information. This information need not have been admitted into evidence or proven beyond a reasonable doubt during the guilt phase. § 76–3–207(2)(a)–(b).[6]

¶ 60 Section 76–3–207 specifically outlines some aggravating and mitigating circumstances that may be presented. "Aggravating circumstances include those outlined in Section 76–5–202." § 76–3–207(3). Mitigating circumstances that may be presented include: (a) a lack of significant criminal history, (b) mental or emotional disturbance while committing the homicide, (c) the presence of duress or domination of another, (d) a lack of capacity to appreciate the wrongfulness of · his conduct or to conform his conduct to the law due to mental disease, intoxication, or drugs, (e) defendant's youth, (f) defendant's role as an accomplice or relatively minor participation, (g) *any other fact in mitigation of the penalty.* § 76–3–207(3). Despite these specific enumerations of aggravating and mitigating factors, subsection 76–3–207(2)(a)(iv) still declares that evidence may be presented on "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the sentence." Plus, the statute clearly provides for consideration of evidence and circumstances that may not have been admitted into evidence or proven beyond a reasonable doubt during the guilt phase. *See* § 76–3–207(2). It therefore follows that the aggravating and mitigating circumstances outlined in subsection (3) are not all-inclusive. Consequently, the trial judge did not err in considering the aggravating factor of aggravated sexual abuse of a child. Even though the jury did not find, beyond a reasonable doubt during the guilt phase, that defendant killed the victim while engaged in the commission of or in an attempt to commit sexual abuse of a child, the facts and circumstances regarding the alleged sexual abuse of the child were properly presented and considered at sentencing. In fact, it was the defendant himself who presented information at sentencing on this factor. It was defendant's witness who testified regarding defendant's sexual abuse of the victim's granddaughter at the crime scene. Dr. Nancy Cohn, a psychologist, testified on defendant's behalf at sentencing that defendant admitted to her that he sexually molest-

---

**6.** Subsection 76–3–207(2)(b) reads, in relevant part, "Any evidence the court considers to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence."

ed the victim's granddaughter by digitally penetrating her.

### C. The Remaining Aggravating and Mitigating Factors

¶ 61 The trial court did not err in considering the remaining aggravating and mitigating factors challenged by defendant on appeal. The remaining factors challenged by defendant as improperly considered include defendants criminal record, the victim's identity,[7] use of a deadly weapon, defendant's intoxication and alcoholism, defendant's relatively young age, defendant's childhood circumstances, particularly the alleged molestation of defendant as a child, the impact of defendant's potential execution on the children at the crime scene, defendant's tribal affiliation, and defendant's alleged unlikelihood to engage in violence in prison.

¶ 62 First, these factors satisfy the standards under *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). They do not apply to every defendant convicted of a murder, but to a subclass of defendants convicted of murder; and no factor is unconstitutionally vague.

¶ 63 Second, each factor was proper to consider under the statute. As we explained previously, information or evidence presented during the sentencing phase need not have been admitted into evidence or proven beyond a reasonable doubt during the guilt phase, *see, e.g.*, § 76–3–207(2)(a)–(b), and the aggravating and mitigating circumstances outlined in subsection (3) as permissible factors for consideration are not all-inclusive.

¶ 64 Even further, if one of these remaining aggravating factors were constitu-

tionally or statutorily improper to consider, the error would not undermine our confidence in the trial court's sentence; under *Zant v. Stephens*, a death sentence supported by multiple aggravating circumstances need not always be set aside if one aggravating factor is invalid. 462 U.S. 862, 890, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). To a certain extent this is because, in comparing the totality of the aggravating circumstances against the totality of the mitigating circumstances, the comparison is not in terms of the relative numbers of the aggravating and mitigating factors, but in terms of their respective substantiality and persuasiveness—their weight. *State v. Wood*, 648 P.2d 71, 83 (Utah 1981). Plus, we also afford a measure of discretion to the conclusion reached by the trial judge who weighs evidence received regarding aggravating and mitigating factors presented during the penalty phase.

¶ 65 To us, these factors are not, when considered with the others weighed by the trial judge, so weighty as to change the outcome of the sentence. The trial judge's written Judgment, Sentence, and Commitment suggests the same. The trial judge's Judgment, Sentence, and Commitment intimates the weight given to the various factors based on the thoroughness of discussion given to each. At the outset, the trial judge more thoroughly discusses the factors of object rape, aggravated sexual assault, aggravated burglary, and aggravated sexual abuse of a child. He then less thoroughly addresses as aggravating factors the defendant's character, background, history, and mental and physical condition, and the victim and the impact of the crime on the victim's fami-

---

7. Defendant claims the victim's identity and other victim impact evidence should be disallowed from consideration at sentencing as a matter of constitutional law. With respect to federal constitutional law, to the contrary is *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), in which the United States Supreme Court held that the Eighth Amendment did not prohibit the consideration of victim impact evidence relating to the victim's personal characteristics and the impact of the murder on the victim's family. *See also Jones v. United States*, 527 U.S. 373, 391–402, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Defendant also intimates in a one-sentence paragraph, followed by four paragraphs copied and pasted from *State v. Carter*, 888 P.2d 629 (Utah 1995), that this court

should find a provision in the Utah Constitution on which to exclude victim impact evidence, footnoting five Utah constitutional provisions as suggested bases. Defendant does not, however, do anything more than offer that the footnoted constitutional provisions could be used by this court to support an exclusion of victim impact evidence. He does not, in any meaningful fashion, discuss how any of these constitutional provisions should be interpreted to exclude victim impact evidence. As we have repeatedly reminded, this court is not simply a depository in which the appealing party may dump the burden of argument and research. *E.g., State v. Bishop*, 753 P.2d 439, 450 (Utah 1988). As a result, we decline the invitation to address the issue.

ly. Then, with minimal discussion, he addresses the proffered mitigating factors. Despite being offered by defendant as a mitigating factor, the trial judge deems defendant's criminal history as an aggravating factor. Further, the court briefly mentions defendant's alleged mental or emotional disturbance as untenable. He states that defendant's alleged mental disease, intoxication, or drug impairment did not unduly affect his ability to appreciate the wrongfulness of his actions, and the trial court clearly considered, but gave short shrift to defendant's youth and other factors such as defendant's remorse and alleged childhood victimization. Consequently, given the apparent weight assigned by the trial judge to these remaining factors, any error in concluding that they were appropriate factors to consider would be harmless error; and any error in their consideration does not undermine our confidence in the sentence.

## IV. OTHER ISSUES

¶ 66 In his first supplemental brief, defendant professes that the inappropriate ethnic statement made by the prosecutor during sentencing "compromised or violated at least one of numerous of [defendant's] constitutional rights, including his right to a fair trial, to equal protection and to uniform operation of the laws, and against cruel and unusual and unnecessarily rigorous punishment." In support of this contention, he provides a string cite in a footnote for each constitutional guarantee. He does not, however, analyze these cases or attempt to explain why each is applicable to the prosecutor's comment in the present case.

¶ 67 On appeal, the appellant is required to clearly define the issues and provide accompanying argument and authority; a reviewing court is not simply a depository in which the appealing party may dump the burden of argument and research. *State v. Lafferty*, 2001 UT 19, ¶ 95, 20 P.3d 342; *State v. Thomas*, 1999 UT 2, ¶ 11, 974 P.2d 269. In order to discourage counsel from dumping the burden of argument and research on the court, rule 24 of the Utah Rules of Appellate Procedure requires the brief of the appellant to "contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on," Utah R. App. P. 24(a)(9), and provides that non-compliant briefs "may be disregarded or stricken, on motion or sua sponte before the court," Utah R. App. P. 24(j). In death penalty cases, however, because of the grave and serious nature of the death sentence, this court has retained the prerogative to correct sua sponte manifest and prejudicial errors not objected to at trial or assigned on appeal. *Lafferty*, 2001 UT 19 at ¶ 96, 20 P.3d 342, 370. Nevertheless, in so doing, "we do not abrogate a defendant's obligation or assume the role of an advocate by researching all applicable law and searching the entire record for each and every indication of possible or potential error." *Id.* (citing *State v. Tillman*, 750 P.2d 546, 552 (Utah 1987)).

¶ 68 We decline to assume the role of advocate regarding these remaining contentions. Given the facts and argument before us, we are not persuaded that this case contains manifest and prejudicial errors violating the defendant's constitutional rights, particularly the right to a fair trial, the right to equal protection and uniform operation of the laws, or the prohibition against cruel and unusual punishment.

## CONCLUSION

¶ 69 Utah's aggravated murder statute does not unconstitutionally overlap with the felony murder statute. The alleged unconstitutional overlap does not violate the equal protection of the laws, create a vagueness problem, or violate the uniform operation of the laws. We are not convinced that defendant was charged with aggravated murder for racially discriminatory reasons. Because, in this case, the death penalty was not imposed in an invidious fashion against a particular group of people, is not disproportionate to defendant's level of culpability, and is not outside the general pattern of cases in our state, defendant's sentence passes our test for disproportionality. The evidence admitted at trial is sufficient to support the aggravating factors of object rape and aggravated sexual assault, as well as burglary and aggra-

vated burglary. Finally, the trial court did not consider any inappropriate aggravating or mitigating factors. Accordingly, defendant's conviction and sentence are affirmed.

¶ 70 Chief Justice HOWE concurs in Justice WILKINS' opinion.

DURRANT, Justice concurring:

¶ 71 I concur in Justice Wilkins' opinion. I write separately only to note my view that whether the victim was alive at the time defendant sexually assaulted her is irrelevant.

¶ 72 Defendant's conviction for aggravated murder was supported, in part, by the jury's findings that he committed or attempted to commit three sexually-related aggravating felonies: object rape, forcible sodomy, and aggravated sexual assault. Further, in the sentencing phase of the trial, the district court relied upon object rape and aggravated sexual assault as statutory aggravating factors. Defendant contends that there was insufficient evidence for the jury to conclude that he committed these felonies and for the judge to consider his commission of two of them in sentencing. Specifically, defendant argues that the State failed to establish beyond a reasonable doubt that the victim was still alive at the time he sexually assaulted her, and that, if she was dead at that time, he was guilty not of the felonies of object rape, forcible sodomy, or aggravated sexual assault, but of desecration of a corpse.

¶ 73 Justice Wilkins concludes that the expert testimony of Dr. Frikke provided a sufficient evidentiary basis for the jury to find that defendant sexually assaulted the victim while she was still alive, and further concludes that even if it were assumed that the victim was not alive at the time of the sexual assault, the evidence was sufficient to support the aggravating factors of burglary and aggravated burglary. I do not take issue with these conclusions. In my view, however, whether defendant was guilty of the sexual crimes does not turn on whether the victim was still alive at the time of the sexual contact.

¶ 74 We have never addressed the question of whether sexual assault requires that the victim be alive at the time of the sexual contact.[1] Defendant argues that the existence of a corpse desecration statute in Utah, Utah Code Ann. § 76–9–704 (1995), forecloses application of statutes relating to sexual assault in cases where the victim dies before the sexual contact. This is the case, he claims, because the corpse desecration statute applies more specifically to his conduct than those statutes relating to sexual assault.

¶ 75 While it is certainly true that the statutes proscribing object rape, forcible sodomy, and aggravated sexual assault generally contemplate a living victim, I do not believe this forecloses their application in circumstances where the victim dies before the sexual contact occurs. Nor do I believe that the corpse desecration statute is necessarily more specifically addressed to the circumstances of this case than these statutes relating to sexual assault.

1. There is a split in jurisdictions on the question of whether a victim must be alive at the time of the sexual contact in order for a defendant to be guilty of sexually-related crimes. *Compare People v. Hutner,* 209 Mich.App. 280, 530 N.W.2d 174, 176 (1995) (holding that the crime of felonious sexual conduct "requires a live victim at the time of penetration"), *Doyle v. State,* 112 Nev. 879, 921 P.2d 901, 912–14 (1996) (holding that evidence establishing that the penetration occurred at or around the time of death will not support a conviction for sexual assault), *and Commonwealth v. Sudler,* 496 Pa. 295, 436 A.2d 1376, 1379–80 (1981) (holding that victim must be alive at time of penetration for rape conviction), *with Lipham v. State,* 257 Ga. 808, 364 S.E.2d 840, 842–43 (1988) (noting that crime of rape requires that a defendant sexually assault the victim forcibly and against her will, and concluding that these requirements are satisfied by an assault that causes death prior to penetration), *State v. Whitsell,* 69 Ohio App.3d 512, 591 N.E.2d 265, 278 (1990) (holding that "the mere fact that the victim might have been dead by the time the penetration occurred does not detract from [defendant's] culpability" for felonious sexual penetration), *and State v. Brobeck,* 751 S.W.2d 828, 832 (Tenn.1988) (construing aggravated rape statute as being applicable to a situation in which a rapist kills the victim before penetration because (1) neither the language of the statute nor its official code commentary indicated that the legislature intended to impose a "live only" requirement, and (2) requiring the victim to be alive "encourages rapists to kill their victims"); *see generally* John E. Theuman, *Fact that Murder–Rape Victim was Dead at Time of Penetration as Affecting Conviction for Rape,* 76 A.L.R.4th 1147 (1990).

¶ 76 None of the sexually-related statutes at issue here expressly requires a living victim, *see* Utah Code Ann. § 76–5–402.2 (1999) (object rape); *id.* § 76–5–403(2) (forcible sodomy); *id.* § 76–5–405 (aggravated sexual assault), and defendant admits that each of these statutes can be read generally as encompassing offenses against dead victims. Further, an essential aspect of each of these statutes is the use of force to override the will of the victim. In the case at bar, defendant clearly achieved his sexual objectives through the use of force. The fact that the force was so great as to also result in the death of his victim, and that her death may have occurred before the sexual contact, should not reduce his culpability. The concept of force, so central to these statutes relating to sexual assault, does not appear, however, in the statute proscribing the desecration of a corpse. I find it difficult to believe that the legislature, in enacting the corpse desecration statute, intended it to apply, to the exclusion of other statutes relating to sexual assault, in cases where a defendant's single, continuous assault on a victim results in the victim's death and in sexual contact. To the contrary, the statutes proscribing object rape, forcible sodomy, and aggravated sexual assault strike me as being more directly applicable to the circumstances presented by this case than those proscribing desecration of a corpse. *Cf. Lipham v. State,* 257 Ga. 808, 364 S.E.2d 840, 842–43 (1988) (applying rape statute instead of necrophilia statute to factual situation in which it was unclear whether defendant killed victim before raping her).

¶ 77 We therefore adopt a rule that considers the entirety of a defendant's conduct from the beginning of the assault through completion of the sexual contact. Where a defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, and where the express elements of the sexual offense are met—including compelling the victim to submit against her will through the application of force, albeit deadly—the fact that the victim may have died moments before the sexual contact does not reduce the defendant's conduct to the relatively minor offense of desecration of a corpse.

¶ 78 In the case before us, the State presented evidence establishing that six minutes elapsed between the neighbor's call to 911 and the arrival of the police. During this time, defendant attacked the victim, severely beat and bit her, slit her throat four times, vaginally raped her numerous times with a knife, and attempted to commit forcible sodomy on her. Dr. Frikke testified that the victim could have lost consciousness within thirty seconds of infliction of the throat wounds, and died within a minute. Dr. Frikke could not state definitively whether the sexual mutilation occurred before or after death, although she testified that there was definitely blood pressure present when the wounds were inflicted, supporting the determination that the wounds occurred either before or shortly after death. Regardless of the precise time of the victim's death, however, her genital injuries were inflicted by the defendant as part of a single, continuous assault that resulted in her death. Accordingly, whether or not the victim was alive at the time of the sexual contact, the sexually-related felonies were properly relied upon in both the guilt and sentencing phases of the trial below.

¶ 79 Associate Chief Justice RUSSON and Justice DURHAM concur in Justice DURRANT's concurring opinion.